**SO ORDERED.**

**SIGNED this 13th day of April, 2012.**





_____
Robert E. Nugent
United States Chief Bankruptcy Judge

_____

**PUBLISHED**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

IN RE:

|  |  |
|---|---|
| LEVI A. KINDERKNECHT, | Case No. 09-13443 |
| | Chapter 7 |
|         Debtor. | |

LINDA S. PARKS, Trustee,

        Plaintiff,

KANSAS ATTORNEY GENERAL
DEREK SCHMIDT
        Intervenor

v.                               Adversary No. 10-5209

PERSELS AND ASSOCIATES, LLC
and STAN GOODWIN,

        Defendants.

# TABLE OF CONTENTS

I.     Uncontroverted Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       A.    The Players and Persels' Debt Settlement Business Model . . . . . . . . . . . . . . . . . . . . 5

       B.    Kinderknecht's Enrollment in Debt Settlement Plan and
             Retention of Persels Law Firm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       C.    Kinderknecht's Performance of Debt Settlement Plan
             and Persels' Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

       D.    Kinderknecht Sued by Citibank and Termination of
             Debt Settlement Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       E.    The Bankruptcy Trustee Sues Persels and Goodwin
             and Procedural History of Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

II.    Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

III.   Applicable Summary Judgment Standards . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . 20

IV.    Analysis and Conclusions of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

       A.    Kansas Credit Services Organization Act [KCSOA] Claims . . . . . . . . . . . . . . . . . . 21

             1.    Goodwin and Persels are not entitled to summary judgment
                   on the KCSOA claims by virtue of the attorney exemption
                   in § 50-1116(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

             2.    Defendants' violation of the KCSOA is, as a matter of law, also a
                   deceptive act or practice under the Kansas Consumer Protection Act . . . . 24

       B.    Fraudulent Transfer Claim, 11 U.S.C. § 548(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . 25

             1.    Whether Kinderknecht received less than reasonably equivalent
                   value in exchange for his $915 transfer to Persels cannot be
                   determined as a matter of law on this summary judgment record . . . . . . . 25

       C.    Disgorgement of Attorney Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

             1.    The Court cannot conclude as a matter of law that Persels' and
                   and Goodwin's "legal fees" were reasonable . . . . . . . . . . . . . . . . . . . . . . . 27

       D.    Legal Malpractice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

             1.    Summary judgment must be denied where the "common knowledge
                   exception" may apply to the trustee's legal malpractice claim under
                   the factual circumstances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

E.        Breach of Fiduciary Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        1.       Reasonable persons could draw different conclusions whether
Persels and Goodwin breached their fiduciary duty to
Kinderknecht and therefore, summary judgment is inappropriate . . . . . . . . 30

F.        Kansas Consumer Protection Act [KCPA] Claims . . . . . . . . . . . . . . . . . . . . . . . . . 31

        1.       Persels and Goodwin are "suppliers" and subject to the provisions
of the KCPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        2.       Deceptive Acts or Practices, § 50-626 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

                a.      Defendants are entitled to summary judgment on some,
but not all, of the "knowing misrepresentation" claims,
§ 50-626(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

                b.      Defendants are entitled to summary judgment on some,
but not all, of the "representations willfully using exaggeration,
falsehood, innuendo, or ambiguity as to a material fact"
claims, § 50-626(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

                c.      Defendants are entitled to summary judgment on some,
but not all, of the "willful omission of a material fact" claims,
§ 50-626(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

                d.      Defendants are entitled to summary judgment on some, but not all,
of the remaining deceptive act claims under § 50-626(b) . . . . . . . . 40

        3.       Defendants are not entitled to summary judgment on the KCPA
unconscionability claims where there is sufficient evidence in the
record of unconscionable conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

G.        Constitutionality of the KCPA, the KCSOA, and the KCSOA's
Attorney Exemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

        1.       The KCPA and the KCSOA do not violate the separation of
powers doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

        2.       The KCSOA attorney exemption statute, § 50-1116(b), is not
unconstitutionally vague as applied to Persels . . . . . . . . . . . . . . . . . . . . . . . 49

V.        Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

<u>MEMORANDUM OPINION</u>

Kansas consumer protection law prohibits both deception and unconscionable conduct in offering consumers debt settlement services. While it also prohibits firms that are not registered with the State Bank Commissioner from supplying those services, Kansas law establishes a safe harbor that exempts Kansas lawyers who supply debt settlement services in the course of practicing law from registration and regulation by the Commissioner. Persels and Associates, L.L.C. ("Persels"), a law firm owned and controlled by Neil J. Ruther, Esq., enters into independent contractor agreements with Kansas attorneys as part of a calculated effort to slip into this safe harbor. None of the lawyers who work directly for Persels is admitted to the Kansas bar or practices in Kansas. Persels is an unregistered credit services organization that represents to Kansas consumers that it will "represent" them as attorneys in the negotiation and settlement of their debts. It made these (and more) representations to Levi Kinderknecht, the debtor in this chapter 7 case, and received over $1,000 from Kinderknecht for its purported services.

His chapter 7 trustee, Linda S. Parks, sued both Persels and Stan Goodwin, one of Persels field attorneys in Kansas, in connection with their "representation" of Kinderknecht.[1]  Parks asserted a variety of state law tort claims, state law consumer violations, and a 11 U.S.C. § 548 fraudulent conveyance claim, all arising from Kinderknecht's enrollment and participation in a debt settlement plan with Persels. After discovery was complete, the defendants moved for summary judgment on all claims. Because genuine disputes of material fact exist with respect to some claims but not others, the defendants' motion for summary judgment must be denied in part and granted in part. Among the

---

[1]  The trustee Linda S. Parks appears in this proceeding by her attorney Gaye B. Tibbets of Hite, Fanning & Honeyman.  Defendant Persels & Associates, L.L.C. appears by its attorney W. Thomas Gilman of Redmond & Nazar, L.L.P. Defendant Stan Goodwin appears by his attorney Christopher M. Joseph of Joseph & Hollander, P.A.

-4-

defendants' assertions was their claim that they are exempt from the provisions of the Kansas Credit Services Organization Act (KCSOA), KAN. STAT. ANN. § 50-1116(b)(2005). The Persels law firm is a limited liability company that is neither owned by or employs Kansas lawyers. Because none of its individual lawyers are "licensed to practice law in this state," and because entities are not "licensed" to practice law, Persels is not exempt from the provisions of the KCSOA, including the requirement that it register with the State Bank Commissioner, § 50-1118. Further, Persels' failure to register with the State Bank Commissioner is a *per se* deceptive act or practice in violation of the Kansas Consumer Protection Act (KCPA) under § 50-1132. Finally, neither the KCSOA nor the KCPA is unconstitutional as applied to Persels and Goodwin. As discussed below, defendants are entitled to summary judgment on some of the tort and statutory liability claims, but not all of them.

     I.     <u>Uncontroverted Facts</u>

          A.     <u>*The Players and Persels' Debt Settlement Business Model*</u>

Understanding Persels workflow requires a description of the cast of characters who participate in it. CareOne Services, Inc., not a party to this proceeding, is a national company registered with the Kansas Bank Commissioner under the Kansas Credit Services Organization Act (KCSOA), KAN. STAT. ANN. § 50-1116 *et seq.* to provide debt *management* services to Kansas consumers. A debt management plan is a plan in which a debtor's creditors agree to stay attempts to collect a debt while the debtor makes payments under a plan that pays all debts in full. CareOne refers those debtors who do not have the income or assets to participate in debt management to Persels & Associates, LLC for debt *settlement*. In that debt settlement process that Persels advertises, Persels negotiates with debtor's creditors for a reduction in the amount of the debt. The debtor makes payments to Persels to fund the payment of its attorneys fees and the compromised debts. In this case, CareOne referred debtor Levi Kinderknecht to Persels for debt settlement. Persels is not registered with the Kansas Bank Commissioner under the

-5-

KCSOA.

Persels is a national law firm, incorporated in Maryland, that advertises it is dedicated to consumer rights. Neil J. Ruther is a member of Persels and holds a 99.75% ownership interest. He is a licensed attorney in the State of Maryland.

Clients referred to Persels by CareOne are provided an engagement agreement and various documents regarding the services and representation to be provided by Persels and other disclosures. Persels collects financial information and data from the potential client regarding his unsecured debts, his creditors, monthly income and expenses, from which Persels determines the client's disposable income and a payment schedule for a debt settlement plan. Upon a new client electronically signing the retainer agreement, he is considered Persels' client. Under the retainer agreement, the client makes monthly payments of his or her disposable income to Persels pursuant to a payment schedule.[2] For the first 18 months, nearly all of the monthly payments go toward legal fees. Once the fees are paid, the monthly payments are held in trust, to be applied toward settlements with creditors. No negotiations with creditors or settlements occur until the client has paid in and accumulated enough funds to pay the negotiated amount of the compromised debts.

Persels contracts with CareOne for administrative and support services and use of CareOne's licensed computer software. For each client referred by CareOne, Persels pays CareOne a monthly fee for:

> collecting and storing client data, mailing of letters and other documents to Clients and their creditors on behalf of and in the name of P&A [Persels], otherwise communicating with Clients and their creditors on behalf of and in the name of [Persels], processing payments to [Persels] from Clients, providing assistance to [Persels] with respect to reporting and other requirements related to the collection, deposit and disbursement of funds and fees from attorney trust accounts maintained by [Persels], and providing such other services as the Parties may agree upon from time to time (collectively, the

---

[2] Ex. 6 and Ex. 11.

-6-

"Services").  CareOne will provide administrative staff, communications systems and software as may be reasonably necessary to promptly and efficiently provide the Services as [Persels] and its staff attorneys reasonably may direct.[3]

In short, CareOne administers the enrollment process for debt settlement with Persels, collects the financial data and information from the client to set up a debt settlement plan, and administers the debt settlement payments and the client's escrow account.  The service contract between CareOne and Persels makes clear that CareOne, in performing these services, acts as Persels' agent and solely on behalf of Persels.[4]  It earns $50 for each new client set up and $32 each week during the first 12 months the client is in the debt settlement program.  The weekly fee is less if the client remains in the program more than 12 months. CareOne employees provide the client retainer package to the client and obtain the client's electronic signature on the retainer agreement.  They also send out a notice to creditors that Persels represents the client.  Some administrative staff are designated as "credit negotiators" to contact a client's creditors and obtain settlement offers on debts when sufficient funds are accumulated from the client's payments to pay on settled debts.  The licensed software used by CareOne (and Persels) enables staff and attorneys to make and enter plan notes in the client's case.[5]

At some point in the process, a Persels staff attorney reviews the information collected by administrative staff and conducts "underwriting" to determine if the client is an appropriate candidate for debt settlement before the client's file is assigned to a field attorney.[6]  Persels has approximately 30

---

[3] Ex. 4, para 1.

[4] Ex. 4, para 15. The parties stipulated to the admissibility of the CareOne service contract, subject only to relevancy objections.

[5] *See* Ex. 17 - Note Log on Kinderknecht's Plan.

[6] The point in time when the "underwriting process" occurs is disputed.  Persels contends that it occurs before the debtor is accepted as a client.  The trustee contends, at least in Kinderknecht's case, that he had already signed the retainer agreement (and was already a client) before Persels' staff attorney conducted the underwriting.

staff attorneys, half of whom work in Maryland and half of whom work from their home offices across the country. None is admitted to practice in Kansas.

In addition to CareOne personnel and Persels staff attorneys, Persels has field attorneys in virtually every state, including Kansas. After Persels signs a debtor up for debt settlement and the debtor pays an initial legal fee, Persels assigns the client to a field attorney in the state in which the field attorney is licensed to practice. The field attorney makes an introductory call to the client. Thereafter, the field attorney monitors or reviews the client file monthly and enters notes in the Persels software and may communicate with CareOne personnel, credit negotiators, or Persels employees. If the Persels client is sued by a creditor, the field attorney is available to provide advice to the client but the field attorney does not enter an appearance in the case or otherwise represent the client in court. They may draft answers and other pleadings for the client to sign and file *pro se*. The pleadings disclose that they were prepared by a Persels attorney.

Stan Goodwin was the Kansas field attorney for Persels assigned to Kinderknecht. Goodwin's relationship with Persels is defined by an Independent Contractor Agreement under which Goodwin agreed to provide legal services to Persels' clients, including: " . . . providing legal advice in the general practice of law, Debt Settlement, Bankruptcy, . . .".[7] Goodwin does not practice law apart from his arrangement with Persels and has no clients other than those assigned to him by Persels; these number approximately 500 clients. Goodwin does not file bankruptcy cases or practice in this court. His only experience representing debtors is dealing with Persels clients enrolled in a debt settlement plan. He does not have access to the escrow account set up for the debtor's payments. He is paid a flat fee of approximately $10-12 per client per month and is issued a 1099 from Persels for his work. Goodwin

---

[7] Ex. 2. The parties stipulated to the admissibility of the Agreement, subject only to relevancy objections.

does not record or keep time records for his services, but did enter notes on Kinderknecht's plan in the computer software upon his monthly review of the client file.

The success rate of Persels clients is dubious at best. During the one year period from October 2008 to October 2009, Persels enrolled 681 Kansas residents in a debt settlement program. 320 participants terminated within six months and 465 participants dropped out of the program within one year.

B.     *Kinderknecht's Enrollment in Debt Settlement Plan and Retention of Persels*

In 2009, Kinderknecht was receiving collection letters from his creditors and feared that he would be sued by one of them. After an internet search for companies that help people get out of debt and as an alternative to bankruptcy, he called CareOne on February 19, 2009.[8] He discussed his concerns about being sued by creditors with CareOne. CareOne referred Debtor to Persels for debt settlement and transferred his call to Persels. A CareOne employee answered the call and identified herself as a Persels representative. Kinderknecht also told the Persels representative that he was afraid of being sued and going through court. He believed it would be "set in stone" and could not be changed. Kinderknecht has college degrees in biology and nursing.

During the call, the Persels representative e-mailed to Kinderknecht a client retainer package to review. It included a retainer agreement;[9] a letter to Kinderknecht and Stephanie McGinty [his live-in girlfriend] that explained informed consent for joint representation;[10] a document titled Debt Settlement

---

[8] Dkt. 96, p. 5, Stipulation 8.

[9] Ex. 6, Retainer Agreement.

[10] Ex. 7.

Representation Summary and General Disclosures;[11] a Bankruptcy Code § 527(a) and (b) disclosure;[12] a payment schedule;[13] a debt schedule;[14] and a personal financial summary and monthly cash flow statement.[15]

According to her file notes, the Persels representative, reading from a script, advised Kinderknecht about several points: (1) Persels fees would total 15% of his debts, (2) Persels would collect the fee over the initial 18 months of the plan; (3) the initial $100 legal fee was due on March 2; (4) Kinderknecht's monthly payments were $162.90 which included a legal fee of $140.13 for the first five months, then $100.10 a month for months 6 through 18; (5) the monthly payments began March 13 and would be held in trust; (6) no payments would be made to creditors until they agreed to a settlement offer; (7) any creditors might pursue legal action to collect their debt before they accepted a settlement offer; (8) Kinderknecht should notify Persels when he received communication from his creditors; (9) Persels would send cease and desist letters to creditors upon receipt of Kinderknecht's initial payment; and (10) Persels would notify Kinderknecht of all settlement activity but he should not expect any activity until the escrow account had accumulated enough money over an unspecified period of time.[16]

Kinderknecht enrolled the following unsecured debts to be included in the debt settlement

---

[11] Ex. 8, Debt Settlement Representation Summary and General Disclosures.

[12] Ex. 9 and 10.

[13] Ex. 11, Payment Schedule.

[14] Ex. 12, Debt Schedule.

[15] Ex. 13, Personal Financial Summary and Monthly Cash Flow.

[16] Ex. 17, Notes History Log.

-10-

plan:[17]

| Creditor | Debt Amount |
|---|---|
| Bank of America | $ 4,798.00 |
| Chase | $ 2,905.00 |
| Citi | $ 2,965.00 |
| CitiFinancial Retail Services | $ 1,101.00 |
| Sam's Club | $ 2,244.00 |
| Total | $14,013.00 |

He had monthly disposable income of $22.90 to pay toward these unsecured debts.[18]  Notwithstanding his meager disposable income, the payment schedule attached to the retainer agreement called him to make 60 monthly payments of $162.90, for a total of $9,774.00.[19]  Of his monthly payment, $140 went toward his legal fees the first 5 months and $100.00 was applied to his legal fees the next 13 months, for a total legal fee of $2,000 to be paid over the first 18 months of the plan. Thus, after deduction of the legal fees and completion of the 60 month plan, Kinderknecht would pay in and have available $7,774 to pay on his unsecured debts.

The Retainer Agreement obligated Kinderknecht to pay legal fees of $2,000.00 over the first 18 months of the plan for Persels' 60 months' representation, with the first $100 to be paid "when we receive this signed contract."   Kinderknecht was also subject to a $150 "termination fee" if he terminated Persels' representation before the completion of the 60 month plan term or if all his enrolled debts were successfully settled.[20]

---

[17] Ex. 12.

[18] Ex. 13.

[19] Ex. 11.

[20] Ex. 6, para. 5.

-11-

The Retainer Agreement further provided, in pertinent part:[21]

3.       . . . **You understand that until a creditor accepts our offer, the creditor may keep trying to collect the debt. The creditor's collection efforts <u>may include filing a lawsuit against you</u>.  In the event you are sued, we will assist you in preparing an answer to such suit and will negotiate with the creditor's attorney on your behalf.  We will <u>not</u> go to court with you or file an appearance on your behalf, as the cost of doing so would be prohibitive.  We will advise you on what the creditor can do, if anything, with a judgment and will work with you to revise your debt reduction plan if it's necessary to serve your interests.  More complex legal services like answering interrogatories, responding to demands for production of documents or preparing legal memoranda and the like will be billed separately but at vastly reduced rates.  You will be notified of the charge for any such services before we perform them.**

*       *       *

6.       . . . You understand that this attorney will not represent you in litigation, but will assist you in preparing appropriate documents and for any possible appearance at trial.

*       *       *

18.       **No Guarantee**.  The success of your debt resolution depends on your making consistent monthly payments and the willingness of your creditors to accept our offers.  <u>We cannot guarantee results</u>.  Some or all of your creditors may try to collect your debts and sue you, and we cannot stop them from exercising their legal rights.

The Debt Settlement Representation Summary and General Disclosures made the following

additional disclosures and statements:[22]

> *You will be represented for purposes of negotiation of your debts by a Persels & Associates, LLC attorney licensed in your state of residence.  Your attorney* will review your progress regularly and will be available to answer any legal questions or deal with any legal issues that arise during the course of your representation. Our administrative staff will be available to assist you with any purely administrative or non-legal issues you may experience. . . .

---

[21]  Ex. 6.  As defined in paragraph 1, the Agreement retains the Persels firm "and its administrative staff at CareOne Services, Inc."

[22] Ex. 8 (emphasis in italics added).

Debt settlement requires you to make regular monthly payments of your disposable income to Persels . . . We will take our agreed legal fee over the first 18 months of the 60 month representation (see your Client Retainer Agreement for a complete month by month fee schedule). The balance of your payments for the first 18 months and all of your payments after 18 months will be deposited in a highly secure Attorney's Trust account for use in settling your debts. **THIS MEANS THAT THERE WILL BE LIMITED FUNDS AVAILABLE FOR SETTLEMENT DURING THE FIRST 18-24 MONTHS OF THE REPRESENTATION.**

We will work diligently with your creditors to help them understand that receiving what you can afford to pay on the debt is in everyone's best interest. **HOWEVER, THE MERE FACT THAT WE REPRESENT YOU CANNOT PREVENT A CREDITOR FROM ASSERTING ITS RIGHTS BY SUING YOU TO OBTAIN A MONEY JUDGMENT.**

Should you be sued by an aggressive creditor we will assist you with responding to the suit and will advise you of your legal options. **WE WILL NOT REPRESENT YOU IN COURT.** One of your options may be to consider filing bankruptcy protection as that is the only legal means of stopping judgment creditors from pursuing your non-exempt income and/or assets.

Clients are "enrolled" for Persels' settlement services in the following way. After a potential client has contacted Persels, it sends the client an e-mail that contains a link to CareOne's website which contains three screens with further links to documents for the client to review: Client Retainer, Power of Attorney, HIPPA Creditor Letter, Debt Settlement Disclosures, Debt Schedule, Personal Financial Summary, and Additional Disclosures. After the client opens the link and reviews the documents, he can check a box and click "I agree," signaling his receipt of the documents and agreement to their terms.

Kinderknecht electronically signed the retainer agreement on February 19, 2009.[23] When he signed on with Persels, he believed he had hired a lawyer, that he was not going to get sued by his creditors, and that by hiring a lawyer, he would be able to resolve his debt in 60 months. Prior to retaining Persels, he had never hired a lawyer before. He would not have signed on if he had

_____

[23] The notes log on Kinderknecht's account reflect that he retained Persels and enrolled in the debt settlement plan at or about 3:37 p.m. on February 19, the same day he initially contacted CareOne. *See* Ex. 17, plan note ID reference no. 1949991 and entry dated 2/19/2009.

-13-

understood that this relationship offered him no protection from suit by his creditors and that he would

have to represent himself in court. Nor would he have enrolled in debt settlement had he been informed

that most people who sign up for debt settlement do not complete the plan.

That same date Persels confirmed by letter its representation of Kinderknecht and a summary

of what would take place next, and assured Kinderknecht that the Persels lawyers "are here to help you

every step of the way."[24] Persels also cautioned Kinderknecht:

> Until your creditors accept our offers, they may not acknowledge your enrollment in our
> plan. . . . This process takes time. Creditors may continue to take legal action. Rest
> assured that we are here to work with you every step of the way."[25]

According to the log, a Persels attorney named "Swyngaard" conducted an "Attorney Record Review"

on February 20, 2009. [26]  Goodwin identified this individual as Sara Wyngaard, a Persels attorney living

in Mexico. This notes log entry apparently references the "underwriting" conducted by a Persels staff

attorney to determine that the debtor is an appropriate candidate for debt settlement before assigning

the debtor to a field attorney.

On February 27, 2009 Kinderknecht made his initial payment to Persels – the $100 legal fee, by

an authorized debit to his account.  On March 5, 2009, Persels sent form letters to Kinderknecht's

creditors advising that Persels represented him "for the limited purpose of settling their debts," and

directing creditors to cease further contact with their client.[27]

Persels assigned field attorney Goodwin to Kinderknecht's case on or about March 5, 2009.  The

notes log on Kinderknecht's plan indicate that Goodwin attempted a "welcome call" to Kinderknecht

---

[24] Ex. 19.

[25] *Id.*

[26] Ex. 17, plan note reference ID 1959450 entry of 2/20/09.

[27] Ex. 18.

-14-

on that date, left a voice message on his phone, and sent an e-mail. On March 9, Goodwin made phone contact and consulted with Kinderknecht. In some cases, Goodwin may advise a client that bankruptcy is a better option for them than debt settlement, based on certain factors. When he gives that advice to a client, he notes it in the client's file. He made no such notation in Kinderknecht's file.

C.   *Kinderknecht's Performance of Debt Settlement Plan and Persels' Representation*

Kinderknecht made the following payments to Persels:

(1)   $100 on February 27, 2009 by ACH debit,

(2)   $162.90 on March 12, 2009 by ACH debit,

(3)   $162.90 on April 14, 2009 by money order,

(4)   $170 on May 21, 2009 by money order,

(5)   $170 on June 16, 2009 by money order,

(6)   $170 on June 25, 2009 by money order, and

(7)   $180 on August 5, 2009 by money order.[28]

These payments totaled $1,115.80 of which Persels kept $915 for legal fees. No disbursements were made to Kinderknecht's creditors on settled debts. Sufficient funds never accumulated in Kinderknecht's escrow account to warrant a Persels' credit negotiator to attempt to settle a debt. Neither Goodwin nor anyone else with Persels ever contacted Kinderknecht's creditors to negotiate a settlement of his debts.

According to Goodwin, certain creditors sue Persels clients to collect their debts more often than others. Bank of America and Citi are two such creditors. Neither Persels nor Goodwin communicated this information to Kinderknecht, who owed Bank of America $4,798.00 and Citi

---

[28] Ex. 14, Transaction History in Kinderknecht's Debt Settlement Plan.

$2,965,00.[29]

The notes log indicates that after Goodwin's initial contact with Kinderknecht, he "reviewed" Kinderknecht's file on April 7, May 4, June 4, July 3, and August 3. The notes log does not reveal that Goodwin had any contact or communication with Kinderknecht between March 9 and August 3, until Kinderknecht was sued.[30]

D.     <u>Kinderknecht Sued by Citibank and Termination of Debt Settlement Plan</u>

Citibank sued Kinderknecht to collect his debt, serving him with summons and a petition on August 7, 2009.[31] He contacted Persels that day and forwarded the papers to Persels on August 11. When Kinderknecht spoke to Goodwin about the summons on August 9, 2009, he realized for the first time that Persels' representation of him did not include court appearances.[32] Goodwin explained to Kinderknecht that he could represent himself. Goodwin received the lawsuit papers on August 13 and on August 17, prepared form pleadings in response to the Citibank suit, and e-mailed them to Kinderknecht. Goodwin told Kinderknecht that he would try to work with Citibank's attorneys to get them to not pursue him, but Goodwin never contacted Citibank's counsel regarding the suit. On September 26, Goodwin conducted a file review and called Kinderknecht for the status of the Citibank litigation, leaving a voice message. Goodwin sent another request for the lawsuit status when he reviewed the file October 30. Because Kinderknecht did not want to defend himself *pro se* against

---

[29] Ex. 12.

[30] *See* Ex. 17.

[31] The plaintiff contends that the suit was brought by "Citibank" but Kinderknecht's debt settlement plan refers to two debts or creditors, one being "Citi" and the other being "CitiFinancial Retail Services," but there are no references to Citibank per se. Ex. 12. The discrepancy is unexplained. In any event, the record is clear that some arm of Citi sued the debtor.

[32] Dkt. 96, p. 6, Stipulation 12.

-16-

Citibank, he hired a local bankruptcy attorney and filed a chapter 7 petition on October 20, 2009. On November 2, 2009, Kinderknecht canceled the debt settlement plan.[33]  Persels refunded $200.80, the balance in his trust account, to Kinderknecht on November 10, 2009.[34]

E.      *The Bankruptcy Trustee Sues Persels and Goodwin and Procedural History*

Kinderknecht's bankruptcy case trustee commenced the current adversary proceeding on October 1, 2010.  As listed in the final pretrial order,[35] she asserted a variety of claims against Persels and/or Goodwin.[36] They include (1) avoiding a fraudulent transfer under 11 U.S.C. § 548(a)(1)(B) because Kinderknecht did not receive reasonably equivalent value in exchange for the fees he paid; (2) claims for the commission of deceptive practices and unconscionable acts in the services provided Kinderknecht in violation of the Kansas Consumer Protection Act (KCPA), KAN. STAT. ANN. §§ 50-626 and 627 (2005 and 2010 Supp.); (3) common law legal malpractice; (4) breach of fiduciary duty; (5) disgorgement of unreasonable attorneys' fees; and (6) claims that Persels and Goodwin violated the Kansas Credit Services Organization Act (KCSOA), KAN. STAT. ANN. § 50-1118 (2005) by providing credit services without  registering with the state bank commissioner and without complying with the other provisions of that act. The defendants move for summary judgment on all of the trustee's claims.[37]

---

[33] Ex. 17.

[34] Ex. 14.

[35] Dkt. 96.

[36]  Initially, the trustee also sued Jimmy B. Persels individually, one of Persels & Associates former owners. She now concedes in her summary judgment response that she has no claims against defendant Jimmy B. Persels in his individual capacity and abandons any claims against him. The Court therefore dismisses the adversary proceeding as to defendant Jimmy B. Persels, and amends the case caption to reflect his dismissal from the case.

[37]  Dkt. 77. With respect to the KCSOA claims, defendants contend that they are exempt from the provisions of the Act.  They do not move for summary judgment with respect to the merits of the alleged violations of the Act if they are found not to be exempt.

-17-

In their summary judgment memoranda, the defendants also challenged the constitutionality of the KCSOA and the KCPA as sought to be applied to them under the circumstances here. The Court certified the constitutional challenge and the Kansas Attorney General intervened to defend the constitutionality of the state statutes as sought to be applied here.[38] The parties separately briefed the constitutional challenge and this aspect of the case is addressed at the end of this opinion.[39]

The defendants moved early on to withdraw the reference from this Court for cause.[40] On March 4, 2011, I recommended that the District Court defer withdrawal of the reference until completion of discovery and dispositive motions.[41] Once any dispositive motions were decided, the reference would be withdrawn on any surviving jury trial claims and transferred to the District Court. The District Court adopted that recommendation. Since that time, the Supreme Court handed down *Stern v. Marshall*, creating new jurisdictional concerns for bankruptcy judges.[42] Defendants have recently renewed their motion to withdraw the reference in light of *Stern*, contending that I lack authority to enter a final judgment even on dispositive motions and that my power is limited to making proposed findings of fact and conclusions of law on all non-core and jury-triable core claims.[43]

II.    Jurisdiction

I first re-examine my authority to enter a final order on the defendants' summary judgment

---

[38] *See* Fed. R. Civ. P. 5.1.

[39] Dkt. 101, 122.

[40] Dkt. 17. *See* 28 U.S.C. § 157(d).

[41] Dkt. 39. *See* D. Kan. Rule 83.8.6(f).

[42] 131 S. Ct. 2594, 180 L. Ed 2d 475 (2011), *reh'g denied* 132 S. Ct. 56, 180 L.Ed 2d 924 (Aug. 15, 2011).

[43] Dkt. 124, filed March 8, 2012.

-18-

motion. The defendants timely demanded a jury trial on all of the trustee's claims and withheld their consent to a bankruptcy judge conducting that jury trial. In making my recommendation to the District Court concerning their initial motion to withdraw the reference, I concluded that the motion should be deferred pending my deciding the summary judgment motion now before me and that the reference should be withdrawn as to any surviving actions. Nothing offered by the defendants in support of their renewed *Stern* motion changes that view.

Of the trustee's five causes of action, only her fraudulent transfer claim is a core proceeding under 28 U.S.C. § 157(b)(2)(H). Defendants are entitled to a jury trial on that claim, but that fact does not preclude my entering a final order granting summary judgment if that is warranted. The balance of the trustee's claims are non-core proceedings that are, at best, related to the case as that term is used in § 157(c)(1). Whether they are matters of private right or not, I remain empowered to decide them and submit proposed findings of fact and conclusions of law to the District Court for its review. As I have noted in my recently-entered order in *Lewis* involving similar litigation, I do not consider these cases to be at all similar to the circumstances in *Stern v. Marshall*, nor is my jurisdiction of them limited by the rule in that case: that bankruptcy courts lack the power to enter a final judgment on a counterclaim against a claimant under § 157(b)(2)(C).[44] Neither of these defendants is a claimant in Kinderknecht's bankruptcy and the trustee's claims are not counterclaims. Therefore, except with respect to any order I may enter on the § 548(a) fraudulent transfer claim, my findings of fact and conclusions of law made in determining the instant summary judgment motion should be deemed proposed findings of fact and conclusions of law under Fed. R. Bankr. P. 9033.[45]

---

[44] *See Parks, Trustee v. Consumer Law Associates, LLC, et al (In re Lewis),* 2012 WL 1073126 (Bankr. D. Kan. Mar. 29, 2012) [Adv. No. 10-5098, dkt. 194]. *See also Stern v. Marshall, supra;* 28 U.S.C. § 157(c)(1) and (d).

[45] *See* 28 U.S.C. § 157(c)(1) and (e).

-19-

III.    <u>Applicable Summary Judgment Standards</u>

Fed. R. Civ. P. 56 governs summary judgment motions and is made applicable to adversary proceedings by Fed. R. Bankr. P. 7056. A court's task on summary judgment is to determine whether there is a genuine dispute as to any material fact, considering the supporting materials submitted and cited by the parties, and whether the undisputed facts entitle the movant to judgment as a matter of law.[46]   I may not weigh the evidence or determine the truth of the matter for myself but may only determine whether there is a genuine dispute for trial.[47] The Supreme Court in *Anderson* succinctly described the judge's role on summary judgment: "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual [disputes] that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[48]   The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the dispute must pertain to a material fact.[49]   In determining whether a genuine dispute of material fact exists, the Court must construe the record liberally in favor of the party opposing the summary judgment and draw all reasonable inferences from the record most favorably to the nonmovant.[50] A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a genuine disputed fact "is 'material' if under the substantive law it is essential to the proper disposition of the

---

[46] Rule 56(a).

[47] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S. Ct. 2505, 2511, 91 L.Ed. 2d 202 (1986).

[48] *Id.*

[49]*Id.* at 247-248.

[50]*McKibben v. Chubb*, 840 F.2d 1525, 1528 (10th Cir. 1988) (citation omitted); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

-20-

claim."[51] If the moving party does not have the burden of proof on an issue at trial, the movant may carry its initial summary judgment burden by demonstrating a lack of evidence on an essential element of the nonmovant's claim.[52] With these standards in mind, I now turn to my analysis of the trustee's claims and defendants' summary judgment motion.

IV. Analysis and Conclusions of Law

A. **KCSOA Claims**

1. *Goodwin and Persels are not entitled to summary judgment on the trustee's KCSOA claims by virtue of the statutory attorney exemption, § 50-1116(b).*

The Kansas Credit Services Organization Act requires that credit services organizations providing debt management services to Kansas residents first register with the Kansas bank commissioner under KAN. STAT. ANN. § 50-1118 (2005). Persels and Goodwin are credit services organizations that engage in debt management services.[53] Kinderknecht is a Kansas resident.[54] Neither Persels nor Goodwin is registered with the state bank commissioner. They contend that they are exempt from the Act's registration and other requirements because they are attorneys.

The attorney exemption is found in § 50-1116(b) of the Act and states:

Any person licensed to practice law in this state acting within the course and scope of

---

[51] *Anderson, supra* at 247; *Adler, supra.*

[52] *Adler, supra* at 671.

[53] Section 50-1117(c) defines a credit services organization as a "person" who engages in debt management services for a fee. And § 50-1117(d)(1) and (3) define "debt management service" to include "receiving funds from a consumer for the purpose of distributing the funds among such consumer's creditors in full or partial payment of such consumer's debt" or "negotiating or offering to negotiate to defer or reduce a consumer's obligations with respect to credit extended by others." Under the KCSOA, a "person" includes an individual, a corporation, or any other form of entity, however organized. § 50-1117(f).

[54] Section 50-1117(b) defines a consumer as an individual who is a Kansas resident.

-21-

such person's practice as an attorney shall be exempt from the provisions of this act.

To qualify for the attorney exemption, two requirements must be satisfied under the plain language of the statute: (1) that the "person" is licensed to practice law in Kansas; and (2) that the "person" is acting within the course and scope of such person's practice as an attorney.

To the extent that Goodwin was practicing law, he may qualify for the attorney exemption and not be subject to the registration requirement or other provisions of the KCSOA. He is an individual licensed to practice law in Kansas and arguably represented Kinderknecht in the course of his "practice," which consists exclusively of acting as a field attorney for Persels in Kansas and representing *only* clients assigned to him by Persels. He had no engagement or fee agreement with Kinderknecht and did not directly charge Kinderknecht fees. Goodwin received fees from Persels, not Kinderknecht.

Goodwin gave Kinderknecht no specific legal advice about entering into the debt settlement plan. Kinderknecht had already retained Persels and enrolled in the plan before he was assigned to Goodwin. Goodwin did no negotiating with any creditors. Indeed, he testified that he would not have advised Kinderknecht to proceed with debt settlement with respect to Bank of America or Citi. Only when Kinderknecht was sued did Goodwin confer with him about how to proceed and Goodwin's only contribution then was to "ghost" some pleadings and forward them to Kinderknecht for Kinderknecht to sign. Despite his telling Kinderknecht that he would try to dissuade Citi's counsel from pursuing the action, he never did so. If this is the extent of what Goodwin does for his "clients," whether he is "practicing law" as that term is commonly understood is questionable. Therefore, enough dispute remains in the record to deny Goodwin summary judgment on the issue of his being exempt from the KCSOA under § 50-1116(b).

Persels' status under the KCSOA stands on a different footing from Goodwin and compels a different conclusion. Persels is a Maryland limited liability company that holds itself out as a national

law firm dedicated to consumer rights. Although a law firm, might fall within the KCSOA's definition of "person," law firms are not licensed to practice law in Kansas. Nor does Persels suggest or point to facts in this record that would support a finding that the Persels firm (as opposed to its member lawyers) has been granted a license to practice law anywhere. On March 23, 2012 while this motion was pending, the Kansas Court of Appeals handed down its decision in *Consumer Law Associates, LLC, et al v. Stork, Acting Com'r of the Office of the Kansas State Bank Com'r,* and affirmed the state trial court's determination that the attorney exemption in the KCSOA does not apply to a limited liability company or any other entity that is not licensed to practice law by the Kansas Supreme Court.[55] While the plaintiffs in that action (including Persels and Goodwin) represent that they intend to petition for review to the Kansas Supreme Court and the decision is not final, it is persuasive in aiding this Court to predict how the Kansas Supreme Court might interpret the attorney exemption.[56]

Only individual members or attorneys of a law firm may be licensed to practice law. A law firm can only act through the individuals that comprise the firm, just as a corporation can only act by and through individuals. The Persels law firm is comprised of both attorney and non-attorney employees. Obviously, the non-attorney staff of Persels are not licensed to practice law in Kansas or any other state. Persels admits that none of its "staff attorneys" or members is licensed to practice law in Kansas. Nor has Persels identified a Kansas licensed attorney in the Persels firm who represented Kinderknecht and provided legal services to him. Indeed, the fact that Persels has no attorneys licensed in this State is the very reason it needed Goodwin, who is licensed in the state of Kansas, to "represent" the Kansas

---

[55] ___ Kan. App. 2d ___, ___ P.3d ___, 2012 WL 975417 (No. 106,115) (Kan. Ct. App. Mar. 23, 2012), *affirming* 2011 WL 1540350 (Kan. Dist. Ct. Apr. 1, 2011), *motion for reh'g filed* Apr. 2, 2012. Persels and Goodwin are also parties to this proceeding with the Office of the Kansas State Bank Commissioner.

[56] *See* Dkt. 126.

debtor.[57] But Goodwin's relationship with Persels is that of an independent contractor, not a member of the Persels law firm acting as an agent of Persels. Thus, Persels can neither rely on the fact that Goodwin is a Kansas-licensed attorney, nor claim that it "practices" law in Kansas through the instrumentality of a Kansas-licensed independent contractor.[58] Holding otherwise would allow Persels to insulate itself from any liability resulting from Goodwin's conduct because he is an independent contractor while availing itself of the KCSOA safe harbor on the strength of Goodwin's Kansas license. Persels can't have it both ways.

Because no member or associate of the Persels law firm is licensed to practice law in Kansas, the Court need look no further to determine that Persels is not protected by the safe harbor of § 50-1116(b). There is no need to determine whether Persels was acting within the course and scope of such person's practice as an attorney. The Persels law firm is not protected by the attorney exemption in § 50-1116(b) and was required to register with the Kansas bank commissioner and comply with the provisions of the KCSOA.

Defendants' motion for summary judgment on the trustee's KCSOA claims, including the failure to register, must be denied.

> **2.      *Defendants' violation of the KCSOA is, as a matter of law,
> also a deceptive act or practice under the Kansas***

---

[57]  Even if this Court were to conclude that Persels' debt settlement services constitute the "practice of law," a determination that it need not make today, the provision of debt settlement services to Kansas residents such as Kinderknecht, by Persels' staff or by Persels attorneys whom are not licensed to practice law in Kansas, would constitute the unauthorized practice of law in violation of Rule 5.5(a) of the Kansas Rules of Professional Conduct, KAN. S. CT. RULE 226. And even if Persels is not engaged in the practice of law, it may well be engaged in "law related services" and is subject to regulation under KRPC 5.7.

[58]  *See In re Miller,* 290 Kan. 1075, 238 P. 3d 227 (2010) (Suspended Kansas lawyer who caused his professional association to independently contract with a licensed lawyer to render services for the firm effectively contrived a system that allowed the suspended lawyer to continue practicing without a license.).

*Consumer Protection Act.*

Under § 50-1132, the KCSOA specifies that any violation of the KCSOA also constitutes "a deceptive act or practice under the Kansas consumer protection act." Because defendants were not exempt from the registration requirement of the KCSOA, § 50-1118, and they failed to register with the Kansas bank commissioner, they violated the KCSOA. This violation in itself constitutes a deceptive act or practice under the KCPA. Section 50-1132 further provides that a remedy is available under both the KCSOA and the KCPA for violations of the KCSOA. To the extent that the defendants seek summary judgment on all of the trustee's other KCSOA-based claims, that motion must also be denied.

### B. Fraudulent Transfer Claim, 11 U.S.C. § 548(a)(1)(B)

**1. Whether Kinderknecht received less than reasonably equivalent value in exchange for his $915 transfer to Persels cannot be determined as a matter of law on this summary judgment record, where the Court is required to consider the facts in a light most favorable to the trustee and resolve all reasonable doubts in favor of the trustee.**

Section 548 of the Bankruptcy Code provides that the trustee can avoid the transfer of property made by a debtor where debtor "received less than a reasonably equivalent value in exchange for such transfer" and was insolvent on the date of the transfer. Here, the trustee seeks to avoid Kinderknecht's transfer of money for legal fees to Persels in exchange for the services provided. The trustee bears the burden of proving that Kinderknecht received less than reasonably equivalent value from Persels in exchange for the fees he paid.[59] What constitutes reasonable equivalent value is a fact-intensive question based upon "market realities."[60] There is no minimum percentage or amount necessary to constitute

---

[59]  *Kaler v. Able Debt Settlement, Inc. (In re Kendall),* 440 B.R. 526, 532 (8th Cir. BAP 2010).

[60]  *Id.* at 533. *See also BFP v. Resolution Trust Corp.,* 511 U.S. 531, 548 (1994) (Ordinarily, determinations of reasonably equivalent value will be made with reference to fair market value as the benchmark.); *In re Calvillo,* 263 B.R. 214 (W.D. Tex. 2000) (determination of reasonably equivalent value is inherently fact-laden and turns on case-specific circumstances);

-25-

reasonably equivalent value and the exchange of value need not be dollar-for-dollar.[61] It does require a comparison of values - the value of what the debtor received to the value of what the debtor transferred, or, in this case, paid.[62] Those values are determined at the time of the transfer and are viewed from the standpoint of the debtor's creditors.[63] Here, because neither party provided evidence of value of the services provided by Persels, the Court cannot conclude as a matter of law that the services Kinderknecht received were of a value that was reasonably equivalent to what he paid.[64]

Prior to termination of Persels' representation, Kinderknecht had paid Persels a total of $1,115.80, $915 of which it kept for legal fees. Defendants contend that as a matter of law, Kinderknecht received legal services that were of a reasonably equivalent value to $915. The services provided by Persels, mostly through CareOne administrative staff, consisted of gathering financial information from Kinderknecht, calculating a payment plan, transmitting documents and forms for Kinderknecht's enrollment in the debt settlement plan, and monitoring and administering the debt settlement plan and payments for an eight-month period. Because Kinderknecht never paid in enough money to settle his debts under the debt settlement plan, Persels had not begun to negotiate with his creditors when Citibank sued Kinderknecht only six months into the 60-month plan. The summary

---

[61] *Calvillo, supra.*

[62] *Id.; In re First Commercial Management Group, Inc.*, 279 B.R. 230 (Bankr. N.D. Ill. 2002)

[63] *Calvillo, supra* at 219; *In re Racsko,* 2011 WL 4344300 *7 (Bankr. E.D. Tenn. Sep. 14, 2011) (proper focus is on the net effect of the transfer on the debtor's estate – the funds available to unsecured creditors. If unsecured creditors are no worse off because debtor received value reasonably equivalent to what debtor paid, no fraudulent transfer has occurred.).

[64] *See In re American Eagle Coatings, Inc.,* 353 B.R. 656, 662-63 (Bankr. W.D. Mo. 2006) ("Neither side, however, provides the court with any evidence from which it might ascertain what that value might be. As a result, the Court cannot render a conclusion as to whether the Debtor did or did not receive reasonably equivalent value and neither side should be entitled to summary judgment on this point.").

judgment record is silent on the value assigned to these legal services making it impossible to determine here whether Kinderknecht received reasonably equivalent value for his money.

For his part, Goodwin made contact with Kinderknecht upon being assigned his file and reviewed the file each month for the five months. The summary judgment record indicates that the value of each one of these "file reviews" was $12. After Kinderknecht was sued, Goodwin prepared form pleadings and an answer for Kinderknecht and advised him how to appear in his own behalf. The record does not reflect the value of these legal services. But here Goodwin was neither paid by Kinderknecht (there is no transfer to Goodwin) nor was he a member of Persels; he is an independent contractor, and his actions are not attributable to Persels. This raises an additional question whether what value Goodwin provided can even be a part of the "reasonably equivalent value" because Goodwin is not a transferee.[65] As both factual and legal controversies remain on this point, Goodwin must be denied summary judgment on this count.

## C. Disgorgement of Attorney Fees

### 1. The Court cannot conclude as a matter of law that Persels' and Goodwin's "legal fees" were reasonable.

The trustee seeks the disgorgement of the defendants' attorneys fees, asserting that what Persels and Goodwin charged and collected was unreasonable. Defendants counter that they are entitled to retain all their fees as a matter of law because their expert witness "opines" that the fees are reasonable and the trustee has no expert witness to render a contrary opinion. They forget that I am not bound to accept their expert witness's opinion. Instead, the trustee's claim invokes my independent review of the

---

[65] *See In re First Sec. Mortg. Co.,* 33 F.3d 442 (10th Cir. 1994) (Bank that received money from customer for deposit into customer's business account was not initial transferee of funds that customer had received from bankrupt debtor and was not liable to trustee of debtor's estate for return of funds as alleged fraudulent transfer under section 548; to qualify as initial transferee of alleged fraudulent transfer from whom trustee can recover value of property transferred, party must exercise dominion over property with the right to put property to its own purposes).

reasonableness of the fees under the Kansas Rules of Professional Conduct.[66] That review requires me to evaluate reasonableness for myself by examining the evidence using the KRPC 1.5(a) factors. Courts draw upon and apply their own knowledge, professional experience and expertise in determining the value of services provided by defendants and the reasonableness of the fees.[67] In this case, determining what services were performed by defendants, what those services were worth, and whether the fees charged were reasonable in the circumstances should be done after hearing all the evidence. The present summary judgment record when viewed in the light most favorable to the plaintiff suggests that very little work was done over a brief period of time for the amount of money paid by Kinderknecht. Defendants' motion for summary judgment on the disgorgement claim is denied.[68]

### D. Legal Malpractice

On this professional negligence claim, defendants contend that they are entitled to summary judgment as a matter of law because the trustee has no expert witness to support her allegation that Goodwin deviated from the appropriate standard of care for an attorney under these circumstances.[69]

---

[66] KAN. S. CT. RULES, Rule 226, Rules of Prof. Conduct, KRPC 1.5 (2011).

[67] *Johnson v. Westhoff Sand Co., Inc.,* 281 Kan. 930, 940, 135 P.3d 1127 (2006); *Kansas Penn Gaming, LLC v. HV Properties of Kansas, LLC,* 790 F. Supp. 2d 1307, 1314 (D. Kan. 2011). *See also, In re Wood,* 408 B.R. 841 (Bankr. D. Kan. 2009) (Several of the standards in § 330 of the Bankruptcy Code for determining reasonableness of fees are also enumerated as factors to be considered under KRPC 1.5(a)).

[68] Because the Court has concluded that the KCSOA attorney exemption is inapplicable to the Persels firm, the Court also considers that the fee limits under the KCSOA may be relevant to the reasonableness of the fees claimed here. *See* KAN. STAT. ANN. § 50-1126.

[69] The trustee failed to timely designate her expert or submit an expert report. On December 15, 2010, the Court adopted the scheduling proposed by the parties in their Rule 26(f) report. *See* Dkt. 29. The trustee's expert deadline was April 1, 2011. *See* Dkt. 28. On March 29, 2011, the trustee sought a 60-day extension for her expert report which defendants opposed. Dkt. 50, 52. The Court heard the matter on April 7 and denied the trustee's requested extension. Dkt. 57, 90.

-28-

Defendants submit that in the absence of an expert, the trustee cannot prove her claim. They further argue that the "common knowledge" exception is inapplicable here. For her part, the trustee contends that she can establish defendants' malpractice by the common knowledge exception and through the testimony of Goodwin himself, who in answering hypothetical questions acknowledged that bankruptcy may have been a better option for an individual in circumstances similar to Kinderknecht's and his failure to advise Kinderknecht on the bankruptcy alternative to debt settlement.

> **1.    Summary judgment must be denied where the "common knowledge exception" may apply to the trustee's legal malpractice claim under these factual circumstances.**

In legal malpractice actions, expert testimony is generally required to establish the appropriate standard of care required of an attorney and whether the attorney deviated from that standard.[70] Kansas recognizes an exception to this general rule – the common knowledge exception.[71] This exception to required expert testimony was described in *Bowman* as follows:

> There is a common knowledge exception to the rule requiring expert testimony in malpractice cases. Expert testimony is not necessary where the breach of duty on the part of the attorney, or his failure to use due care, is so clear or obvious that the trier of fact may find a deviation from the appropriate standard of the legal profession from its common knowledge.[72]

As applied to the malpractice claim against Goodwin, I cannot conclude as matter of law that expert testimony is required to establish the appropriate standard of care and that Goodwin deviated from it, particularly when his conduct is viewed in relation to the Kansas Rules of Professional Conduct

---

[70] *Bowman v. Doherty,* 235 Kan. 870, 879, 686 P.2d 112 (1984).

[71] *Bowman, supra* at 879 (plaintiff's loss of freedom, for failure to appear before the court when required due to attorney's failure to secure a continuance, fell within the common knowledge exception and did not require expert legal testimony to prove professional negligence); *Leeper v. Schroer, Rice Bryan & Lykins, P.A.,* 241 Kan. 241, 245-46, 736 P.2d 882 (1987) (lost cashier's check sent by attorney to client by ordinary first-class mail did not constitute negligence).

[72] *Bowman, supra* at 879 (citing *Webb v. Lungstrum,* 223 Kan. 487, 575 P.2d 22 (1978)).

applicable to Goodwin and Goodwin's own sworn admissions.[73]

KRPC 1.4(b) requires reasonable communication by the attorney to the client. It provides:

A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

Here, determining whether defendants advised Kinderknecht about the alternative of bankruptcy or the downside of debt settlement is a question for the trier of fact. Under the circumstances, did defendants communicate adequate information for Kinderknecht to make an informed decision to go forward with a debt settlement plan? Did defendants fail to communicate to Kinderknecht that bankruptcy was an alternative to debt settlement? Did defendants fail to communicate information to Kinderknecht that suggested he was not a suitable candidate for debt settlement? The information they omitted – that he was likely to be sued and hailed into court by two of his creditors before completion of debt settlement, that debtors with the size of his debts were often not successful in debt settlement, and that debtors in his situation often ended up filing bankruptcy – is information that an ordinary lay person or jury could conclude is material to the decision whether to proceed with debt settlement. At a minimum, whether the common knowledge exception applies under the plaintiff's evidence and whether the jury should be instructed on it is best left to the trial judge after hearing all of the plaintiff's evidence. The fact that the plaintiff lacks an expert witness does not, standing alone, entitle the defendants to summary judgment on the malpractice claim.[74]

### E. Breach of Fiduciary Duty

#### 1. Reasonable persons could draw different conclusions whether Persels and Goodwin breached their fiduciary duty to Kinderknecht and therefore summary judgment is inappropriate.

---

[73] *See* Fed. R. Evid. 801(d)(2)(A).

[74] *See also DePape v. Trinity Health Sys.,* 242 F. Supp. 2d 585 (N.D. Iowa 2003).

Defendants contend that summary judgment should be granted on the claim for breach of fiduciary duty because there are no facts from which a breach of duty may be inferred. More specifically, they contend that Kinderknecht's debt settlement plan was a viable means of avoiding bankruptcy which was one of his stated goals. They also say that the plan could have been successful if he had made the payments and that his failure was not the result of any breach of their duties as a matter of law. I disagree. Viewing the uncontroverted facts in a light most favorable to plaintiff, as the Court must do on summary judgment, the issue is whether a reasonable person could conclude that defendants breached their fiduciary duty by enrolling Kinderknecht in a debt settlement plan for which he was ill-suited under the circumstances, instead of advising him to file bankruptcy. An attorney has a fiduciary duty to act "with due regard to the interests of the [client] reposing the confidence."[75] Reasonable minds could differ whether defendants acted in Kinderknecht's interests in placing him in debt settlement when his monthly budget showed he had a meager $23 of disposable income to pay on his unsecured debts, he had certain creditors and debt amounts that defendants knew from experience were likely to sue him to collect, he was not protected from suit by creditors, he feared getting sued and having to go to court, and he was not advised that most people enrolling in debt settlement never complete the plan. Whether defendants breached their fiduciary duty to Kinderknecht in these circumstances cannot be determined at the summary judgment stage.

### F.     KCPA Claims

### 1.     Persels and Goodwin are "suppliers" and subject to the provisions of the KCPA.

---

[75] *See Miller v. Sloan, Listrom, Eisenbarth, Sloan and Glassman,* 267 Kan. 245, 258, 978 P.2d 922 (1999) (KRPC 1.4(b) requires that an attorney explain a matter sufficient to permit the client to make informed decisions regarding the representation.); *Stevens v. Jayhawk Realty Co.,* 9 Kan. App. 2d 338, 342, 677 P.2d 1019, *aff'd* 236 Kan. 90, 689 P.2d 786 (1984) (It is the duty of the fiduciary, the person in whom confidence was placed, "to act with the utmost good faith and loyalty for the furtherance and advancement of the interests of the other party.")

Both Persels and Goodwin are "suppliers" within the meaning of the KCPA. A supplier is defined in the KCPA as a "person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer."[76] Defendants contend that as attorneys, they are not suppliers and not subject to the KCPA. I predict that the Kansas Supreme Court would conclude otherwise given its 2007 decision in *Williamson v. Amrani,* where it concluded that the definition of supplier included a health care professional and that the Act applied to a physician in connection with his professional conduct and treatment of a patient.[77] Noting that the KCPA's plain language of the definition of "supplier" encompassed services provided in a physician-patient relationship, the Kansas court also noted other professionals that are subject to the Act as suppliers.[78] That same plain reading of the definitional statute as the *Williamson* court conducted, compels the conclusion that the KCPA applies to attorneys and law firms "dedicated to consumer rights" and providing debt settlement services to consumer debtors.

Moreover, after the Kansas Supreme Court decided *Williamson*, the Kansas legislature amended the KCPA to specifically exclude health care providers from its coverage where a consumer's injury or death is alleged to have resulted from medical malpractice.[79] It did not, however, provide for any other professionals to be excluded from coverage of the KCPA where the consumer alleges injury from that

---

[76] KAN. STAT. ANN. § 50-624(l) (2010 Supp.). A "person" includes an individual or other legal entity. § 50-624(I) (2010 Supp.).

[77] 283 Kan. 227, 152 P.3d 60 (2007). Because the Kansas Supreme Court has not decided the precise issue before this Court, I must attempt to predict how it would rule, considering the rules of statutory construction, the decisions of the Kansas state courts, and the policies behind the KCPA. *See In re Dittmar,* 618 F.3d 1199, 1204 (10th Cir. 2010).

[78] *Id.* at 232 (engineers are suppliers under the KCPA, citing *Moore v. Bird Engineering Co.,* 273 Kan. 2, 41 P.3d 755 (2002)).

[79] KAN. STAT. ANN. § 50-635(b) (2010 Supp.). The alleged supplier has the burden of showing that it falls within this statutory exclusion. § 50-635(c).

-32-

professional's negligence in rendering the services. The legislature is presumed to have acted with full knowledge and information as to the subject matter of the statute, including the judicial decisions with respect to the prior and existing legislation.[80] I therefore conclude that the Kansas legislature declined to exclude any professionals other than health care providers from the KCPA and I cannot read into the statute a similar but unwritten exclusion for attorneys.

Accordingly, in the absence of a specific exclusion for attorneys rendering legal services to consumers, I conclude that the definition of suppliers under § 50-624(l) encompasses Persels and Goodwin and subjects them to the provisions of the KCPA.[81] The conclusion that Persels and Goodwin are suppliers seems particularly compelling given their dedication to "consumer rights" and the Act's stated purposes, not to mention the Legislature's clear direction that it "be construed liberally to promote" the policy of protecting consumers from deceptive and unconscionable practices by suppliers.[82]

### 2. Deceptive Acts or Practices, § 50-626

Section 50-626(b) sets forth a nonexhaustive list of deceptive acts or practices.[83] Whether a supplier has engaged in a deceptive act is ordinarily a question of fact for the jury.[84] But if the record

---

[80] *See In re Sunbelt Grain WKS, LLC,* 427 B.R. 896, 904 (D. Kan. 2010).

[81] This conclusion gives the benefit of the doubt to Persels and Goodwin that the services they provided to Kinderknecht were indeed "legal services," as opposed to debt management services that may or may not be the actual practice of law by "learned professionals." *See also, Rachoza v. Gallas & Schultz,* 1998 WL 171280 at *6 (D. Kan. Mar. 23, 1998) (attorneys or law firms engaged in debt collection activities were subject to KCPA, noting that "[t]he KCPA never has contained an attorney exemption.")

[82] *See* § 50-623.

[83] The acts described in § 50-626(b) are *per se* deceptive. KANSAS COMMENT 1973, § 50-626.

[84] *Gonzales v. Associates Financial Service Co. of Kansas, Inc.,* 266 Kan. 141, 166, 967 P.2d 312 (1998).

-33-

is completely devoid of evidence of a deceptive act or practice, summary judgment is appropriate.[85] While it need not be shown that the consumer relied upon the deceptive act, it *may* require a showing that defendants acted with the intent of deceiving the consumer depending upon the deceptive act alleged.[86]

As noted in the previous analysis of the KCSOA claims, Persels' failure to register with the Kansas bank commissioner is itself a deceptive act or practice subject to liability under the KCPA. Therefore, defendants are not entitled to summary judgment as to this KCPA claim.[87] And, to the extent that the trustee relies on any other violation of the KCSOA to support her deceptive acts claims, those claims also survive summary judgment.

The final pretrial order in this matter lists fourteen (14) alleged deceptive acts upon which the trustee relies.[88] Fortunately, they can be grouped into three categories: (1) knowing misrepresentations regarding the debt settlement services in violation of § 50-626(b)(1); (2) willful use of exaggeration, falsehood, innuendo or ambiguity of a material fact in representations in violation of § 50-626(b)(2); and (3) willful omission, concealment, or suppression of a material fact in violation of § 50-626(b)(3). The defendants contend that they did not engage in deceptive conduct. Accordingly I must examine the uncontroverted facts to determine whether there is evidence of a deceptive act or practice by the

---

[85] *Bomhoff v. Nelnet Loan Services, Inc.,* 279 Kan. 415, 424, 109 P.3d 1241 (2005); *Gonzales, supra.*

[86] *Gonzales, supra* (intent to deceive is a required element, interpreting § 50-626(b)(2) and (3)); *But see Moore v. Bird Engineering Co., P.A.,* 273 Kan. 2, 15-16, 41 P.3d 755 (2002) (distinguishing *Gonzales* and concluding that intent to deceive is not required under § 50-626(b)(1)). *See also,* Kansas PIK Civil 4th 129.01-A, 129.02, 129.03, 129.04, and 103.04 (August 2011).

[87] *See* p. 25, *supra.* Section 50-1132 states that "[a]ny violation of [KCSOA] . . . is a deceptive act or practice under the [KCPA]." The failure of Persels to register with the banking commissioner is a violation of § 50-1118.

[88] Dkt. 96, pp. 17-19. The pretrial order numbers fifteen (15) acts, but it is misnumbered as number 14 is omitted from the list of deceptive acts.

-34-

defendants. If so, the plaintiff's KCPA claim will survive summary judgment.

>    a.    **Defendants are entitled to summary judgment on some, but not all, of the "knowing misrepresentation" claims, §** 50-626(b)(1).

The trustee alleges that Persels represented it was "licensed" to perform debt management in Kansas.[89] No such representation is contained in the summary judgment record. Persels held itself out as a national law firm dedicated to consumer rights, implicitly representing that its members were licensed attorneys. In the absence of any other representation, defendants should have summary judgment on this allegation.

The trustee contends that Persels represented that debt settlement had a benefit to Kinderknecht that it did not have.[90] The retainer agreement clearly spelled out that creditors were not obligated to negotiate Kinderknecht's debts, that he could be sued by aggressive creditors notwithstanding the debt settlement plan, that Persels could not prevent creditors from exercising their legal rights, that results of the debt settlement plan were not guaranteed, and that the plan would likely fail if debtor did not complete his payments. There is no evidence of a contrary representation in the summary judgment record, so defendants are entitled to summary judgment on this claim as well.

The trustee alleges that Persels knowingly misrepresented that Kinderknecht could complete debt settlement in 12-36 months.[91] The retainer agreement and debt settlement plan clearly specified that the plan called for 60 monthly payments. Defendants are entitled to summary judgment on this alleged deceptive act.

The trustee asserts that the fees charged by Persels are out of proportion to the benefits received

---

[89] Dkt. 96, p. 17, ¶ 1.

[90] Dkt. 96, p. 17, ¶ 3.

[91] Dkt. 96, p. 17, ¶ 5.

by Kinderknecht and this is a deceptive act under § 50-626(b)(1).[92]  Because this alleged deceptive act does not involve a representation and there is no evidence of such a representation, defendants are entitled to summary judgment on this alleged deceptive act.

The nonrefundable retainer allegations are sufficient, in part, to withstand summary judgment. The trustee alleges that Persels required clients to pay an upfront unrefundable fee for services it knew or should have known were not going to be rendered; this is not actionable under § 50-626(b)(1) because no such representation occurred.[93]  The trustee also alleges that Persels represented it could impose a nonrefundable retainer.[94]  Persels did represent that Kinderknecht would pay a flat fee of $2,000 over the first 18 months of the representation with $100 paid upon Persels' receipt of the signed retainer agreement.  It implicitly represented that the fees portion of the total monthly payment were nonrefundable because upon early termination of the agreement, only those funds held in escrow for payment of debts would be returned to Kinderknecht; the attorney fees would be taken out of the account by Persels.[95]  Nowhere in the retainer agreement does it provide for return of the paid attorney fees upon early termination of the agreement. This precludes summary judgment on this alleged deceptive act.

As to the remaining knowing representation that the trustee alleges, there is evidence in the record that supports an inference of a deceptive act under § 50-626(b)(1). Persels represented that Kinderknecht was purchasing legal services and representation by a Kansas lawyer. This was a deceptive

---

[92] Dkt. 96, p. 18, ¶ 11.

[93] Dkt. 96, p. 18, ¶ 12.

[94] Dkt. 96, p. 17, ¶ 4.

[95] *See* Ex. 6, ¶s 1, 5.a., 7, 19.

-36-

act.[96] The Persels' workflow model as established by the uncontroverted facts demonstrates that non-lawyers performed the vast majority of services provided to Kinderknecht and that so-called "credit negotiators" – non-lawyer members of Persels' administrative staff – were tasked with negotiating debtor's debts with creditors. Neither Persels staff attorneys nor Kansas attorney Goodwin negotiated any of Kinderknecht's debts. Other than the "cease and desist" letters, no attorney communicated with any of the creditors Kinderknecht enrolled in his plan, despite Persels' representation that he would "be represented for purposes of negotiation of your debts by a Persels . . . attorney licensed in your state of residence."[97] What Kinderknecht was sold were debt settlement services that Persels' dressed up as "legal services" in a bald-faced effort to evade complying with the KCSOA. What could be more deceptive? Summary judgment must be denied on that claim.

> **b.      Defendants are entitled to summary judgment on some, but not all, of the "representations willfully using exaggeration, falsehood, innuendo or ambiguity as to a material fact" claims, § 50-626(b)(2).**

The trustee argues that the same representations set forth above that form the basis for a deceptive act under § 50-626(b)(1) also violate § 50-626(b)(2).  In the absence of any evidence of such affirmative representations, these allegations of deceptive acts under § 50-626(b)(2) must fail for the same reasons. Defendants are entitled to summary judgment with respect to these alleged deceptive acts, except their representations that consumers were purchasing legal services and that Persels could charge a nonrefundable retainer.[98]

> **c.      Defendants are entitled to summary judgment on some, but not all, of the "willful omission of material fact" claims, § 50-626(b)(3).**

---

[96]  Dkt. 96, p. 17, ¶ 2.

[97] Ex. 8.

[98] Dkt. 96, p. 17, ¶ 2 and ¶ 4.

The remainder of the trustee's alleged deceptive acts are premised upon alleged omissions of certain material facts. These include: (1) failing to disclose that few debt settlement clients complete the program/failing to disclose high termination rate in first year or less; (2) failing to disclose that Persels had no reasonable basis for implying that Kinderknecht could avoid bankruptcy by utilizing debt settlement; (3) failing to disclose the advantages of bankruptcy with high credit card debt; (4) failing to disclose that the benefits of debt settlement to consumers similarly situated has not been substantiated; (5) failing to disclose that CareOne derived a benefit from referring business to Persels under the KCSOA, § 50-1121; (6) failing to disclose in its contract that Persels was obligated to provide a notice of right to rescind and the name and address of the Kansas Office of the State Bank Commissioner under the KCSOA, § 50-1132; and (7) failing to disclose that Persels was not "licensed" in Kansas to perform debt settlement services in violation of the KCSOA, § 50-1118.[99]

Most of these omissions pertain to the defendants alleged failure to disclose that bankruptcy relief was a preferable option for Kinderknecht and that he was ill-suited for debt settlement given his circumstances. I conclude that the experience of other debt settlement clients (*i.e.* completion and termination rates) is not a material fact required to be disclosed in the absence of any evidence that other clients' financial situation and debts were similar to Kinderknecht's. Simply put, the experience of others is not predictive of whether Kinderknecht could and would perform his debt settlement plan. Failing to tell Kinderknecht that the benefits of debt settlement to consumers similarly situated are unsubstantiated is not, in and of itself, deceptive for the same reasons. Defendants are entitled to summary judgment on the alleged deceptive acts of failing to disclose that few debtor clients complete the program.

The remaining omissions regarding the bankruptcy option, however, must survive summary

_____

[99] Dkt. 96, pp. 17-19, ¶s 1, 6, 7, 8, 9, 10, 13, and 15.

-38-

judgment because a reasonable person could find Persels and Goodwin willfully omitted material information that would have enabled Kinderknecht to make an informed decision about whether filing bankruptcy was a better option for him, and was deceptive. Neither Persels nor Goodwin disclosed to Kinderknecht that because he had so little disposable income, his debts were simply too high for successful debt settlement to be likely. Persels and Goodwin knew that certain creditors were more aggressive and likely to sue debt settlement clients rather than negotiate the debts. And they knew that Kinderknecht owed two of them money. This would have been particularly relevant information for Kinderknecht. He considered debt settlement because he feared getting sued by his creditors and sought the assistance of attorneys to help him deal with his creditors. Had Persels or Goodwin told him that, Kinderknecht might not have enrolled in debt settlement or retained Persels to represent him. Yet neither Persels nor Goodwin ever discussed with Kinderknecht the advantages and disadvantages of debt settlement versus bankruptcy or explained why he was a suitable candidate for debt settlement (assuming that evaluation was ever performed).

The latter three omissions also support the trustee's claim that certain violations of the KCSOA constitute deceptive acts. These claims turn on whether defendants qualify for the KCSOA's attorney exemption under § 50-1116. Because I previously concluded that the Persels law firm is not licensed to practice law in this state, Persels does not enjoy the benefit of the attorney exemption and is required to comply with the KCSOA. "Any violation" of the KCSOA or rules and regulations promulgated thereunder "is a deceptive act."[100] Section 50-1121(m) prohibits a person from giving any consideration for the referral of a consumer to the registrant's credit services organization business. Section 50-1118 prohibits a person from engaging in credit services organization business with a Kansas resident without first registering with the state banking commissioner. Section 50-1120 imposes numerous duties upon

---

[100] KAN. STAT. ANN. 50-1132 (2005).

a registrant under the KCSOA. Those duties include: (1) providing the consumer with a list of those creditors the registrant reasonably expects to participate in the debt management plan and those it does not;[101] (2) incorporating in the written debt management services agreement a notice of the consumer's right to rescind the agreement at any time;[102] (3) providing the name of each creditor the registrant reasonably expects not to participate in the debt management plan;[103] and (4) providing a notice regarding complaints and questions to the state bank commissioner.[104] The form agreement did contained a notice of the right to rescind and, therefore, Persels should be granted summary judgment on that alleged deceptive act,[105] but as for the other KCSOA-based deceptive acts, summary judgment must be denied.

        **d.    Defendants are entitled to summary judgment on some, but not all, of the remaining deceptive act claims under § 50-626(b).**

The remaining deceptive acts asserted by the trustee rely upon the same conduct as discussed above but are alleged to violate different subparagraphs of § 50-626(b), specifically § (b)(5), (6), (7), (8), (9) and (12). Demonstrating any of the deceptive acts described by § 50-626(b)(7), (8) and (9) requires showing a false statement. Persels did not falsely state that it was licensed to perform debt management in Kansas – it made no statement about that – therefore there is no basis for the violation of § 50-626(b)(8) that the trustee asserts in the pretrial order.[106] The same is true for that conduct described in

---

[101] Section 50-1120(b)(2).

[102] Section 50-1120(c)(3).

[103] Section 50-1120(c)(6).

[104] Section 50-1120(c)(11).

[105] Ex. 6, p. 3, ¶ 19.

[106] Dkt. 96, p. 17, ¶ 1.

-40-

the final pretrial order that does not involve a misrepresentation and therefore, summary judgment is appropriate on these alleged § 50-626(b)(8) violations.[107]

There are no false statements in the record regarding pricing comparisons made by Persels. Defendants are entitled to summary judgment on the two alleged § 50-626(b)(7) violations.[108] Three of the trustee's four alleged violations of § 50-626(b)(9) which prohibits a false statement that "services, replacements or repairs" were needed, are based on alleged nondisclosures. I cannot see how § 50-626(b)(9) applies where no statement has been made. The fourth (b)(9) claim – that the defendants failed to explain the advantages of bankruptcy – does not support an allegation that Persels falsely represented that Kinderknecht needed its services. Indeed, it is very clear to me that Kinderknecht patently needed debt relief in some form. Thus, summary judgment is granted on all of the four alleged deceptive acts under § 50-626(b)(9).[109]

The trustee alleges one § 50-626(b)(5) violation - the failure to disclose the first year high termination or drop out rates of consumers in Persels' plans.[110] But subsection (b)(5) prohibits a supplier from offering services "without intent to sell them" and simply doesn't apply here. Likewise, the trustee alleges one (b)(6) violation - requiring an upfront unrefundable fee for services that Persels knew or should have known would not be rendered.[111] But, subsection (b)(6) proscribes offering services without intent to supply the expected public demand. There is no suggestion in the record that Persels did not

---

[107] Dkt. 96, p. 18, ¶ 7 and ¶ 13 (allege omissions, not false statements) and ¶ 12 (no misrepresentation alleged).

[108] Dkt. 96, p. 17-18, ¶s 4 and 12.

[109] Dkt. 96, p. 18, ¶s 7, 8, 9 and 4.

[110] Dkt. 96, p. 18, ¶ 8.

[111] Dkt. 96, p. 18, ¶ 12.

-41-

intend to supplying their debt resolution services or representation or that they would "run out" of them. These subparagraphs are aimed at retail "bait and switch" tactics, a practice that nothing in this record supports.[112] Defendants are entitled to summary judgment on these two alleged deceptive acts.

That leaves the trustee's remaining deceptive act alleged under § 626(b)(12) which makes certain deceptive print advertisements actionable. Her complaint is that Persels represented that Kinderknecht was purchasing legal services and representation by lawyers in Kansas.[113] But the trustee has not pointed to anything in the summary judgment record that would constitute a "printed advertisement" so (b)(12) does not apply. Summary judgment is granted on this alleged deceptive act.

3. **Defendants are not entitled to summary judgment on the KCPA unconscionability claims where there is sufficient evidence in the record of unconscionable conduct.**

Whether defendants' conduct was unconscionable under the KCPA is a question of law for the Court.[114] Although unconscionability is not specifically defined by the KCPA, the statute gives the Court guidance in determining unconscionable acts by reference to several inclusive circumstances "of which the supplier knew or had reason to know . . ."[115] It is more a matter of over-reaching than of deception.[116] And the purpose of imposing liability for unconscionable acts or practices is to prevent oppression and unfair surprise.[117] Only if there is no evidence of unconscionable acts may summary

---

[112] *See* § 50-626, Kansas Comment 1973, para 2.

[113] Dkt. 96, p. 17, ¶ 2.

[114] KAN. STAT. ANN. § 50-627(b); *Farrell v. General Motors Corp.,* 249 Kan. 231, 238, 815 P. 3d 538 (1991).

[115] *See* § 50-627(b)(1)-(7).

[116] § 50-627, KANSAS COMMENT ¶ 1.

[117] *See Wille v. Southwestern Bell Tel. Co.,* 219 Kan. 755, 758, 549 P.2d 903 (1976).

-42-

judgment be granted to the defendants on the unconscionability claims.[118]

The trustee's statutory unconscionability claims are numerous and tend to overlap. This overlap carried over to the pretrial order, requiring me to categorize the contentions she made in that document and compare them to what she claimed in her summary judgment responses. This was no easy task, but after completing it, I conclude that the plaintiff charges the defendants with the following unconscionable conduct.

      a.    Defendants took advantage of Kinderknecht's inability to protect his interests because of his financial distress, ignorance about bankruptcy, and lack of familiarity with lawyers' practices, prices, and with other debt management companies in violation of § 50-627(b)(1).

Kinderknecht holds two college degrees and is considerably more educated than many consumer debtors. The retainer agreement he executed is not particularly complex, highlights several key provisions limiting the scope of representation, and is not couched in legalistic terms. While Kinderknecht may not have been acquainted with how lawyers bill and what fees were reasonable for the services provided, there is no evidence that he price-shopped or made any other effort to educate himself that was thwarted by the defendants. Nor is there any evidence in the record about comparative rates or pricing for debt settlement services. While debt settlement may have been a poor choice for Kinderknecht, it was the option he chose. This, standing alone, does not establish that defendants' conduct was unconscionable.[119]

But in this case, there is more. I have concluded that Persels is likely to be subject to the

---

[118] *Bomhoff v. Nelnet Loan Services, Inc.,* 279 Kan. 415, 109 P.3d 1241 (2005); *Osterhaus v. Toth,* 39 Kan. App. 2d 999, 1005, 187 P.3d 126 (2008).

[119] *See Wille, supra* at 759-60 (a "simple, old-fashioned bad bargain" does not establish a case of unconscionability); *Gonzales v. Associates Financial Service Co. Of Kansas, Inc.,* 266 Kan. 141, 166, 967 P.2d 312 (1998) (transactions that, in retrospect, are bad bargains, do not state a claim under the KCPA).

provisions of the KCSOA, so the fee caps in § 50-1126 apply. Persels knew that if it was subject to the KCSOA its fee structure was far beyond what was permitted by law. In addition, requiring Kinderknecht to pay his "legal fees" in full before starting to renegotiate his debts, work that was only to be done by a non-lawyer, may be the type of overreaching conduct sanctioned by the KCPA. Kinderknecht's debt settlement plan was drawn up and administered almost exclusively by non-lawyer administrative staff, rendering it questionable whether he even received legal services at all. Summary judgment on this alleged unconscionable act is therefore denied.

      b.      Persels charged fees grossly in excess of the price at which similar services were readily obtainable in similar transactions by similar consumers in violation of § 50-627(b)(2).

Because Persels was subject to the KCSOA, its fees were capped like other credit services organizations engaged in debt settlement services under § 50-1126. It knew that like services could be obtained for substantially less from registered credit services organizations and it knew from its litigation with the Kansas bank commissioner that its claimed attorney exemption from the provisions of the KCSOA had been rejected. Defendants are not entitled to summary judgment on this unconscionability claim.

      c.      Given Kinderknecht's income, financial obligations, and level of debt, he was unable to receive a material benefit from the debt settlement plan in which he enrolled, evidencing a violation of § 50-627(b)(3), (4), and (5).

There is ample factual support in the record to support this claim and preclude summary judgment. Given that Kinderknecht had only a meager amount of disposable income to fund a debt settlement plan in relation to the size of his debts to be resolved through debt settlement, that he was required to pay what were characterized as legal fees up front, and the fact that two of his creditors were likely to sue him anyway, these defendants knew or should have known that he would be unable to accumulate sufficient funds for payment on his debts and that they would never even reach the stage in his plan to commence negotiations with creditors to reduce his debts.

-44-

> d.    When Persels drafted Kinderknecht's debt settlement plan, there was no reasonable probability that he could pay it in full, § 50-627(b)(4) and (5).

Defendants must be denied summary judgment on this claim of unconscionable conduct for the same reasons set out above. There is sufficient evidence in the record from which the trial court hearing the case could conclude that defendants engaged in unconscionable conduct in violation of § 50-627(b)(4) and (5).

> e.    The transaction was excessively one-sided in favor of Persels in violation of § 50-627(b)(5).

There is ample evidence to support this claim, too.  It is particularly troubling that Kinderknecht paid Persels its legal fees up front, before it had earned them by performing what it promised under the retainer agreement – the negotiation of Kinderknecht's debts with his creditors. Instead of charging Kinderknecht a reasonable fee for legal services to negotiate his debts and providing him with actual legal counsel, Persels charged a high fee for nothing more than administrative and ministerial activities performed by non-lawyer personnel. Kinderknecht  effectively received nothing because Persels never performed any debt negotiation services, yet retained all the "legal fees" that Kinderknecht paid. Summary judgment on this unconscionability claim is denied.

> f.    Persels made misleading statements of opinion on which Kinderknecht was likely to rely to his detriment, § 50-627(b)(6).

Defendants are not entitled to summary judgment on this final claim of unconscionability, either. At best, Persels sent Kinderknecht mixed signals. First, it held itself out as a "national law firm" that was "completely dedicated to giving [him] independent advice and to serve [his] interests only [that would] work on [his] behalf to negotiate settlements with [his] creditors . . ."[120] Kinderknecht was justified in thinking he had hired *lawyers* to represent him and deal with his creditors, but this turned out to be a

---

[120] Ex. 6.

false sense of security, particularly when considered in light of some of Persels' other statements. In its retainer agreement, Persels assured him that "you will receive basic legal services as part of your Legal Fee," and that he would "be represented for purposes of negotiation of your debts by a Persels . . . attorney licensed in your state of residence." In fact, Goodwin *never* negotiated with Kinderknecht's creditors, even after he was sued by Citi. Then, in its welcome letter, Persels suggested that by hiring the law firm, Kinderknecht had "[taken] control of [his] finances. . . . We're pleased to have you as a client, and are here to help you every step of the way."[121] Persels repeated that assurance again in the welcome letter: "Creditors may continue to take legal action. *Rest assured that we are here to work with you every step of the way,"* except, of course, if those steps included being sued. When that happened, Persels was not there for any "step of the way." Persels was also not there to negotiate with creditors and never would be unless Kinderknecht paid the necessary (but undisclosed) amount to trigger settlement negotiations. In reality, Kinderknecht had in no way "taken control of his finances" and Persels knew it.

### G. Constitutionality of the KCPA, the KCSOA, and the KCSOA's attorney exemption.

The defendants challenge the constitutionality of the KCPA and the KCSOA as applied to them, asserting that these statutes violate the separation of powers doctrine and that the KCSOA's attorney exemption is unconstitutionally vague.

The KCPA and KCSOA serve the State of Kansas' substantial interest in protecting Kansas consumers. The KCPA, enacted in 1973, protects consumers from suppliers of goods and services who engage in deceptive or unconscionable conduct in consumer transactions.[122] The KCSOA, enacted in 2004, protects Kansas consumers from misconduct by unregulated individuals and organizations that

---

[121] Ex. 19.

[122] § 50-623. *See generally,* KAN. STAT. ANN. § 50-623 *et seq.* (2005 and 2010 Supp) [KCPA].

-46-

provide debt management services to Kansans.[123] A violation of the KCSOA is, as a matter of law, also

a deceptive act or practice under the KCPA.[124] Both of these consumer protection enactments, afford

a private remedy to consumers in a court of law.[125] The Kansas attorney general is responsible for

enforcement of the KCPA and the state bank commissioner is responsible for administering the

KCSOA.[126] For the reasons set forth below, neither the KCPA nor the KCSOA is unconstitutional as

applied to Persels and Goodwin.

### 1. The KCPA and KCSOA do not violate the separation of powers doctrine

A state statute is presumed to be valid and constitutional.[127] The standard for determining

whether a statute passes constitutional muster is well-established:

> A statute is presumed constitutional and all doubts must be resolved in favor of its
> validity. If there is any reasonable way to construe a statute as constitutionally valid, the
> court must do so. This court not only has the authority, but also the duty, to construe
> a statute in a manner that it is constitutional, if the same can be done within the
> apparent intent of the legislature in passing the statute. However, we may not rewrite
> a clear and unambiguous statute to make it pass constitutional muster.[128]

The separation of powers doctrine is violated when the challenged legislation permits one branch of

government to usurp or intrude into the powers of another branch of government.[129] In the absence

---

[123] *See generally,* KAN. STAT. ANN. § 50-1116 *et seq.* (2005) [KCSOA].

[124] § 50-1132.

[125] KCSOA, § 50-1133 and KCPA, § 50-634, 50-636, and 50-638.

[126] KCSOA, § 50-1118, -1124, -1127 and -1128 and KCPA, § 50-628 through 50-633.

[127] *Blue Cross and Blue Shield of Kansas, Inc. v. Praeger,* 276 Kan. 232, 276, 75 P. 3d 226 (2003) (A statute must clearly violate the constitution before it may be struck down).

[128] *Rural Water Dist. #2 v. City of Louisburg,* 288 Kan. 811, 817, 207 P.3d 1055 (2009), quoting *Martin v. Kansas Dept. Of Revenue,* 285 Kan. 625, 629-30, 176 P.3d 938 (2008).

[129] *State ex rel. Morrison v. Sebelius,* 285 Kan. 875, 882-83, 179 P.3d 366 (2008).

-47-

of usurpation of another branch's powers, the separation of powers doctrine itself requires the court to presume the legislation is constitutional.[130]  In analyzing whether the challenged statute violates the separation of powers doctrine, this court must search and determine whether one branch of government has usurped the powers of another branch.[131]  Defendants have the "weighty" burden of establishing a statute's unconstitutionality.[132]

Neither the KCPA or the KCSOA has improperly usurped the powers of another branch. The defendants have not clearly articulated that usurpation.  Both acts regulate transactions with consumers (without excepting from their ambit the practice of law), provide consumers with a private remedy for violation of their provisions, and provide for the judicial branch to adjudicate those private disputes. This does not violate the separation of powers doctrine.

Nor does the KCSOA and KCPA  usurp the judicial branch's authority to regulate the practice of law.  Defendants suggest that applying the KCSOA and KCPA to them as attorneys infringes on the Supreme Court's exclusive power to regulate attorneys in the practice of law. But this is absurd. There is no legal authority that makes the Kansas Supreme Court the exclusive forum before which private disputes between consumers and attorneys may be tried. If it were, any legal claim against a Kansas lawyer, including any statutory or common law contract or tort claim, including legal malpractice, would fall within the original and exclusive jurisdiction of the Kansas Supreme Court. In the KCPA and KCSOA, the legislature made lawyers susceptible to statutory causes of action that may be the subject of private litigation before a court of law. It does not violate the separation of powers doctrine.

Indeed, the structure of the KCSOA actually respects the separation of powers by excluding

---

[130] *Id.* at 883.

[131] *Id.* at 884.

[132] *Barrett v. U.S.D. 259,* 272 Kan. 250, 255, 32 P.3d 1156 (2001)

-48-

attorneys from its coverage so long as they are (1) a person licensed to practice law in Kansas, *and* (2) acting within the course and scope of such person's practice as an attorney. An out-of-state law firm such as Persels is not "licensed" to practice law in Kansas. Indeed, Persels has not identified a single Persels attorney that dealt with Kinderknecht and is licensed to practice law in the state of Kansas or admitted to practice before the Kansas courts. The Kansas Supreme Court does not regulate the practice of law by out-of-state law firms or attorneys. The Kansas Supreme Court's regulation of the practice of law extends to attorneys licensed to practice law in Kansas. But as Goodwin's status reveals, Kansas licensure is not the only criterion for the KCSOA attorney exemption; he must also be acting within the course and scope of such person's practice as an attorney. As noted previously, Goodwin had no practice apart from assisting Persels clients enrolled in a debt settlement plan. He received no attorney fees from Persels clients. Goodwin was not acting within the course and scope of his "practice as an attorney." Similarly, Persels is a credit services organization under the KCSOA and provides debt management services for a fee through non-lawyer administrative staff.[133] This is precisely the entity and activities the legislature intended to regulate. The KCSOA does not impermissibly encroach upon the Kansas Supreme Court's power to regulate the practice of law; rather it regulates persons providing debt management services and provides protections for consumers of those services.

The KCSOA and KCPA as applied to these defendants does not violate the separation of powers doctrine and is constitutional.

> **2.  The KCSOA attorney exemption statute, § 50-1116(b) is not unconstitutionally vague as applied to Persels.**

Persels also contends that the attorney exemption statute is unconstitutionally vague because a corporation or other entity form is included in the KCSOA's definition of "person," and therefore

---

[133] KAN. STAT. ANN. § 50-1117(c) and (d), defining a "credit service organization" and "debt management service."

-49-

the attorney exemption should be applied to Persels – an out-of-state law firm.[134]

When it is applied to a statute regulating a business, the vagueness standard is a common sense determination of fairness – whether an ordinary person exercising common sense can understand and comply with the statute.[135] Persels focuses on the definition of "person" under the KCSOA but ignores the other criteria of the attorney exemption statute, § 1116(b). There is no dispute that Persels is a "person" as defined in the KCSOA. Persels did not lose the safe-harbor because it was a corporation or a law firm; it lost it because it is not *licensed to practice law* in Kansas. As discussed previously, law *firms* are not licensed to practice law in Kansas, lawyers are. None of Persels' attorneys are licensed to practice law in Kansas. The trustee correctly observes that granting the attorney exemption to an out-of-state law firm such as Persels would free it to supply credit services to Kansas consumers without being regulated or restricted by either the consumer protection laws and the KCSOA or the Kansas Rules of Professional Conduct.

There is nothing vague or uncertain about the exemption statute. It clearly and unambiguously spells out the requirements to qualify for the exemption – that the "person" be licensed in this state and acting within the course and scope of their practice *as an attorney*. That it is impossible for the Persels law firm to qualify for the exemption does not make it unconstitutionally vague. Persels motion for summary judgment on grounds that the KCSOA attorney exemption is unconstitutionally vague is denied.

---

[134] Section 50-1117(f) defines "person" to include a corporation . . .or other form of entity, however organized . . . ."

[135] *Double M Const., Inc. v. State Corp. Com'n,* 288 Kan. 268, 277-78, 202 P.3d 7 (2009) (definition of "excavator" in Underground Utility Damage Prevention Act was not unconstitutionally vague; out-of-state subcontractor was a statutory excavator with duty to locate underground utility lines and give notice to Kansas One Call of intent to excavate and was subject to penalty for violation of Act).

V.    Summary

If it walks like a duck and swims like a duck and quacks like a duck, it is a duck.[136]  Persels and Goodwin may hold themselves out as lawyers providing unbundled, limited legal representation, but there is plenty of evidence in the summary judgment record to suggest that they "walk, swim, and quack" like a credit services organization that supplies debt settlement services while posing as a law firm. The summary judgment record is more than sufficient to warrant denying summary judgment on most of the trustee's claims. The trustee is entitled to her day in court to present and prove up those claims.

Accordingly, the defendants motion for summary judgment is granted in part and denied in part as follows:

Summary judgment on the KCSOA claims on the basis that defendants are excluded from its coverage under the attorney exemption, § 50-1116(b), is **DENIED.**  *All* of the trustee's claims under the KCSOA, including the obligation to register with the state bank commissioner, should proceed to trial.

Summary judgment on the fraudulent transfer claim, 11 U.S.C. § 548(a)(1)(B), is **DENIED** as it cannot be determined that reasonably equivalent value was exchanged as a matter of law on this record**.**

Summary judgment on the disgorgement of legal fees is **DENIED** as the judge hearing that claim should evaluate their reasonableness after hearing all of the evidence in the case and assessing the value of the legal services provided by defendants.

Summary judgment on the legal malpractice claim is **DENIED** as I cannot conclude that as a

---

[136] This loosely worded adaptation has been attributed to American poet James Whitcomb Riley (1849-1916) for his famous quote, "When I see a bird that walks like a duck and swims like a duck and quacks like a duck, I call that bird a duck."

matter of law the common knowledge exception is inapplicable.

Summary judgment on the breach of fiduciary duty claim is **DENIED** as the record supports a reasonable inference that a breach of fiduciary duty occurred.

Summary judgment on the KCPA claims is **DENIED IN PART, AND GRANTED IN PART.** Summary judgment on the basis that defendants are not "suppliers" and not subject to the KCPA is **DENIED**, as attorneys are neither exempt from the KCPA nor excluded by the definition of "supplier" under the Act. Summary judgment on certain alleged knowing representations and willful representations under § 50-626(b)(1) and (b)(2), as referenced to the deceptive acts in the final pretrial order (Dkt. 96, pp. 17-18): ¶s 1, 3, 5, 11 and 12 is **GRANTED;** all other representation-based claims under (b)(1) or (b)(2) survive. Summary judgment on the willful omission claims under § 50-626(b)(3), as referenced to the deceptive acts in the final pretrial order (Dkt. 96, pp. 17-19): ¶s 6, 8, 10, and 13 (right of rescission nondisclosure only) is **GRANTED**; all other omission-based claims under (b)(3) survive summary judgment. Summary judgment on the remaining deceptive act claims under § 50-626(b)(5), (6), (7), (8), (9) and (12), is **GRANTED**, except for the two alleged deceptive acts claimed under § 50-626(b)(8) as described in the final pretrial order (Dkt. 96, p. 17, ¶s 2 and 4). Defendants' motion for summary judgment is **DENIED** with respect to the trustee's claims of unconscionability under § 50-627 as there is sufficient evidence of the unconscionable acts described.

Summary judgment is **DENIED** on the defendants' constitutional challenges to the KCPA and the KCSOA as applied to them.

With the Court's ruling on this summary judgment motion, its work on pretrial matters and dispositive motions in this adversary proceeding is now complete. The Court **RECOMMENDS** that the reference be withdrawn with respect to all claims that survive summary judgment and that they proceed to trial in the United States District Court for this District before the Honorable J. Thomas

Marten.  The Clerk of the Bankruptcy Court is directed to provide this Memorandum Opinion to the

District Court as a Report and Recommendation in this matter.

A judgment on decision shall issue this day.

# # #